IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:11CR119 |
| v. ) | |
| ) | Honorable Leonie M. Brinkema |
| TERESA KELLY, ) | |
| ) | Sentencing Date: June 17, 2011 |
| Defendant. ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Denis J. McInerney, Chief, Fraud Section of the Criminal Division of the United States Department of Justice, Patrick F. Stokes, Deputy Chief, and Robert A. Zink, Trial Attorney, and Neil H. MacBride, United States Attorney for the Eastern District of Virginia, Charles F. Connolly and Paul J. Nathanson, Assistant United States Attorneys, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G.") § 6A1.2 (Nov. 2010), files this Position of the United States With Respect to Sentencing of the defendant, Teresa Kelly. For the reasons discussed herein, the government requests that the Court assess a statutory maximum sentence of 5 years and reduce that sentence by approximately 75% based on the defendant's substantial assistance to the government's investigation for a final sentence of one year and one day of incarceration.

## *Background*[1]

Lee Farkas was the chairman and principal owner of Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), a mortgage company based in Ocala Florida. Colonial Bank was one of the 25 largest depository banks in the country and was based in Montgomery, Alabama. Colonial's Mortgage Warehouse Lending Division ("MWLD") provided financing to mortgage origination companies, including TBW. From approximately 2002 through August 2009, Farkas and numerous co-conspirators, including Teresa Kelly for parts of the scheme, defrauded three banks of more than $2.9 billion, misled shareholders of Colonial BancGroup, Inc., and attempted to fraudulently obtain more than $500 million from the government's TARP program.

The conspiracy consisted of five separate schemes:

1. **Overdraft / sweeping scheme:** Beginning in 2002, Farkas and other co-conspirators engaged in a "sweeping" scheme to hide overdrafts in TBW bank accounts held at Colonial Bank. TBW ran large overdrafts in its Master Account to cover its operating expenses. To cover up the overdrafts, conspirators, including Kelly, "swept" funds on a daily basis into this account from the Investor Funding Account, a Colonial Bank-controlled account. The sweeping scheme, which grew to approximately $140 million, continued until approximately December 2003. In addition to Farkas and Kelly, other co-conspirators participating in the sweeping scheme included Ray Bowman, the president of TBW, and Cathie Kissick, head of the MWLD at Colonial Bank.

2. **Plan B on COLB.** In December 2003, Farkas and Kissick implemented "Plan B," a new phase of the scheme in which they caused the deficit covered up by the sweeping scheme to

---

[1] In light of this Court's familiarity with the facts of this case, the Government includes only a brief overview and recitation of the key facts.

be moved to the COLB facility.  While Plan B was initially supposed to be a one-time event, the conspirators continued to engage in Plan B transactions for years.  Under Plan B, conspirators caused TBW to engage in fake sales of mortgage assets to Colonial Bank.  TBW pretended to sell mortgage loans to Colonial Bank, and the bank advanced TBW money for the loans.  In fact, the mortgage loans either did not exist or had already been sold to other banks or investors.  By mid-2005, Colonial Bank held approximately $250 million in Plan B loans on its books.  In addition to Farkas and Kissick, Kelly and Bowman also participated in Plan B.  As an operations supervisor in the MWLD overseeing a team of analysts, Kelly acted at the direction of Farkas and Kissick in processing most of the Plan B transactions.

      3. **Plan B on AOT.**  Plan B on COLB grew to approximately $250 million and, because of the number of loans involved, became difficult for the conspirators to administer.  In 2005 the conspirators moved Plan B from COLB to Colonial's Assignment of Trade ("AOT") facility.  The AOT facility was intended for the purchase of pools of loans that TBW was in the process of selling or securitizing.  Under this new version of Plan B, the conspirators engaged in fake sales of pools of loans to Colonial Bank, and in return TBW received over $1.3 billion from Colonial Bank from mid-2005 through mid-2008.  The Plan B pools of loans that TBW sold Colonial Bank consisted of nothing more than data for pools of loans that TBW had already sold to other investors.  As such, the Plan B data were worthless to Colonial Bank.  TBW paid down some of the Plan B balance on AOT over time, and by August 2009 Colonial Bank held approximately $500 million worth of worthless Plan B pools on the AOT facility.  Kelly continued her role with Plan B when the scheme migrated to the AOT facility.  Other co-conspirators involved with Plan B on AOT included Farkas and Kissick.  As a result of Plan B, Colonial BancGroup, the public holding company for the bank, significantly overstated the mortgage assets held by the MWLD

in BancGroup's public financial filings, including its annual reports (Forms 10-K) and quarterly reports (Forms 10-Q).

    4. **Ocala Funding ("OF").** OF was a standalone subsidiary of TBW. It was designed to provide low-cost funding to TBW for additional mortgage loan originations. It was also set up to be bankruptcy remote. OF issued commercial paper (corporate IOUs) to investors in return for cash. OF would then use the cash to fund mortgage loans at TBW. OF was required to have at all times more assets (cash + loans) than liabilities (the commercial paper). And, OF cash could only be used for OF purposes. When TBW ceased operations in August 2009, there were two investors in OF: Deutsche Bank ("DB") and BNP Paribas, who owned a combined $1.75 billion in commercial paper. Farkas and co-conspirators caused nearly all of the assets in OF to be stripped out and used to pay other TBW expenses, including mandatory servicing advances to investors in mortgage bonds TBW had sold. To cover up the missing assets, Farkas and other co-conspirators caused OF loans already sold to Freddie Mac to continue to appear as collateral at Colonial Bank and OF. As a result, Colonial Bank believed it owned $900 million in loans that had already been sold to Freddie Mac, and DB and BNP Paribas, as the investors in OF, believed they had approximately $1.67 billion in loan collateral backing their supposedly asset-backed commercial paper when in fact there was only collateral of roughly $160 million. Paul Allen, TBW's CEO, and Sean Ragland, a TBW financial analyst, facilitated the conspiracy by causing false collateral reports to be sent to DB and BNP Paribas as well as the custodian for OF, LaSalle Bank (purchased by Bank of America in 2007), that inflated by hundreds of millions of dollars the actual value of the collateral backing the commercial paper. Kissick and Kelly were not involved in the OF phase of the fraud scheme, and Colonial Bank was a victim of this fraud.

5. **Capital Raise.** In the fall of 2008, Colonial BancGroup, Colonial Bank's holding company, applied for more than $550 million of TARP funds. Colonial BancGroup was approved for $553 million contingent upon its raising an additional $300 million in private capital. In early 2009, TBW undertook to lead the capital raise. TBW said it would invest $150 million itself and would find two private equity investors to invest $50 million each. Colonial BancGroup undertook to raise the remaining $50 million from other companies with which it did business. Ultimately, Colonial BancGroup announced on March 31, 2009, that it had met its contingency. That was false; TBW had falsely represented the participation of the two $50 million private equity investors and misrepresented where the 10% deposit for TBW itself had come from. Moreover, Colonial BancGroup's TARP application, which incorporated the bank's financial statements, was materially false in that the fraud scheme caused the bank to significantly overstate the value of mortgage assets on its books. Farkas and Allen were involved in falsely representing the participation of the two $50 million private equity investors. Brown assisted Farkas in obtaining a $25 million deposit on behalf of TBW and the two equity investors by taking the money from OF. While Kissick was not aware of Farkas's misrepresentations regarding the equity investors, she knew that Colonial BancGroup's TARP application relied upon false bank financial data. Kelly was not involved in this phase of the fraud.

*The Appropriate Guidelines Range*

The Probation Officer has calculated the defendant's offense level to be substantially more than 43. In particular, the Probation Officer includes a base offense level of 6, a 30-level adjustment for a loss of more than $400 million, a 6-level adjustment for the number of victims, a 4-level adjustment for substantially jeopardizing the safety and soundness of a financial

institution (reduced by 2 levels pursuant to U.S.S.G. § 2B1.1(b)(14)(C) for a combined increase with the victim-adjustment of 8 levels), a 2-level adjustment for sophisticated means, a 2-level enhancement for her role in the offense, and a 3-level reduction for acceptance of responsibility.

With the exception of the 30-level increase for the loss amount, Kelly stipulated to these adjustments and enhancements in her plea agreement. In the statement of facts accompanying her plea agreement, however, Kelly stipulated that she caused Colonial Bank to purchase from TBW substantially more than $400 million in assets that in fact had no value. Kelly also testified at trial that she tracked Plan B pools on AOT and that, in the end, Colonial Bank records showed there were approximately 48 bogus Plan B pools on AOT with a value of close to $500 million. Kelly's testimony was corroborated by documents and the testimony of Neil Luria and Ray Peroutka.

This results in an offense level of 48, which is revised down to 43 and produces a Guidelines range of life in prison. As Kelly pleaded guilty to a one-count information charging her with conspiracy under 18 U.S.C. § 371, her maximum possible period of incarceration is five years.

*Application of the Guidelines*

I.  **Applicable Legal Standards**

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Guidelines are now advisory. *United States v. Booker*, 543 U.S. 220, 261 (2005). As such, "[i]n the wake of *Booker* . . . the discretion of the sentencing court is no longer bound by the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). The Supreme Court subsequently clarified that this means that the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50

(2007), *quoted in Nelson v. United States*, --- US ----, 129 S.Ct. 890, 892 (2009). Nevertheless, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Instead, at sentencing a court "must first calculate the Guidelines range." *United States v. Nelson,* 129 S. Ct. at 891; *see also United States v. Hughes*, 401 F.3d at 546 (holding that a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing'") (*quoting United States v. Booker*, 542 U.S. at 264). After appropriately calculating the Guidelines, a sentencing court must then consider the Guidelines range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate for the individual defendant. *United States v. Nelson,* 129 S. Ct. at 891-92, *see also United States v. Hughes,* 401 F.3d at 546.

## II.     Sentencing Recommendations

Kelly's role in the conspiracy was substantial. She was fully aware that her actions were fraudulent, she worked closely with Kissick and others in carrying out the fraud scheme, and she administered the day-to-day activities of the fraud on behalf of Kissick and Colonial Bank. While Kelly did have a subordinate role within the fraud scheme, received a modest income as an operations supervisor at Colonial Bank, and appears not to have personally profited from her criminal conduct, the government submits that her plea to merely a five-year maximum sentence charge aptly takes into account these mitigating factors. As explained in more detail below, the government believes that, pursuant to 18 U.S.C. § 3553(a), a Guidelines sentence of five years of incarceration is the appropriate starting point, before a reduction under U.S.S.G. § 5K1.1. As set forth in the § 5K1.1 motion, the government is recommending a reduction of approximately 75% based on Kelly's substantial assistance, and the government's ultimate recommendation for Kelly's sentence is a period of incarceration of one year and one day.

### III. The 18 U.S.C. § 3553(a) Factors

In imposing a sentence in this case, the Court must look to 18 U.S.C. § 3553(a). This section requires that the Court consider, among other things, (a) the nature and circumstances of the offense and the history and characteristics of the defendant; and (b) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a). As noted above, the government believes the § 3553(a) factors warrant an initial sentence of five years before the Court applies a reduction for substantial assistance.

#### A. *Nature and Circumstances of the Offense and History and Characteristics of the Defendant.*

One key factor that the Court must consider is the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The defendant in this case participated in a massive fraud scheme, one of the longest-running and largest bank-fraud operations in history. While she was not involved in every aspect of the fraud, her critical involvement in the sweeping and Plan B phases of the fraud spanned the entire duration of the fraud scheme, from 2002 through the 2009 collapse of TBW and Colonial Bank. The significance of Kelly's role as a Colonial Bank conspirator cannot be over-emphasized. Kelly took direction from Kissick, but she was the day-to-day Colonial Bank employee that processed the vast majority of the sweeping and Plan B transactions, causing the bank—her bank—in the end to hold approximately $500 million in worthless assets. Kelly was fully aware of the unlawful nature of her activities, and, as the operations-level conspirator at Colonial Bank, it was Kelly who understood the way Colonial Bank's systems functioned and what was necessary to successfully complete and conceal the fraudulent transactions. Indeed, Kelly was directly involved in efforts to conceal the Plan B transactions from bank management, auditors,

regulators, and others by undertaking sham transactions that made it appear the assets purchased in Plan B transactions periodically had been sold off of Colonial Bank facilities. Kelly's actions defrauded Colonial Bank and shareholders in Colonial BancGroup, Colonial Bank's public holding company, as well.

  **B.** *Seriousness of the Offense, Respect for the Law, Just Punishment for the Offense, and Deterrence to Criminal Conduct*

The Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). Fraud cases are serious offenses, and those who commit such offenses deserve particularly severe sentences because the nature and complexity of the fraud they commit requires such significant time and resources to detect, prosecute, and deter. An initial sentence at the statutory maximum would appropriately reflect the seriousness of the offense and provide just punishment in this case.

Imposing an initial sentence at the statutory maximum would also afford both specific and general deterrence, as required by 18 U.S.C. § 3553(a)(2)(B). Kelly knowingly and intentionally facilitated a massive fraud scheme for more than seven years, contributing to the collapse of her employer, Colonial Bank. While Kelly's cooperation with the government's investigation suggests that she has fully accepted responsibility for her actions, her lengthy participation in the scheme warrants a sentence that will impress upon her, as well as others, that such conduct will not be treated lightly or tolerated.

If the sentence truly is to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct," it must be substantial. *See* 18 U.S.C. § 3553(a)(2). This is particularly true here in light of the size of the fraud scheme, its duration, and the substantial damage it caused. An

insubstantial sentence would signal that the type of long-standing, egregious fraud in which the defendant engaged is somehow deserving of special consideration from the Court. Moreover, if individuals who defraud financial institutions and corporate shareholders believe that the penalty for doing so is trivial, then no disincentive exists to prevent those who are best-equipped with the means and ability to commit fraud from doing so. An initial sentence at the statutory maximum, before applying a reduction for substantial assistance, is necessary to satisfy the requirements of § 3553(a)(2).

      C.    *The Need to Avoid Unwarranted Sentencing Disparities*

The government's recommendation that the Court impose an initial sentence of five years will avoid any unwarranted sentencing disparities between Kelly and her co-defendants who pleaded guilty and testified against Farkas.[2] Kelly faces a shorter initial sentence than most of these co-conspirators, except Ragland, and her role in the fraud scheme warrants such treatment. As the Court is aware from the evidence admitted at trial, and as noted above, Kelly reported to Kissick and held a lower-level position at Colonial Bank, and she was involved only in the sweeping and Plan B aspects of the fraud.

The government intends to recommend a substantially higher sentence for Farkas. The government respectfully submits that an initial sentence for Kelly of five years (and the recommended initial sentences for the other co-defendants) will not create an unwarranted disparity with a lengthy sentence imposed on Farkas because of the substantially different roles each played in the scheme and the different postures of their cases. Farkas led the fraud scheme, in part, by manipulating his co-defendants and limiting the flow of information to them. He was

---

[2] The government has included a chart in its under-seal motion for a reduction in sentence that contains its sentencing recommendations, including suggested reductions for substantial assistance, for each of the cooperating co-defendants.

the overwhelming beneficiary of the scheme, he stood to gain the most as the owner of TBW, and he lived a lavish lifestyle that none of his co-conspirators shared. Kelly's and her cooperating co-defendants' cases also are in a very different posture than Farkas's. They each pleaded guilty pre-indictment, fully accepted responsibility, have shown remorse for their actions, and cooperated substantially with the government's investigation.

*Restitution*

The government is still in the process of identifying victims and their loss amounts. The amount of potential restitution in this case is enormous, with some defendants potentially facing restitution orders of up to $2.9 billion. While it is unlikely that the victims will recover the full amount from the defendants, the government needs additional time to identify victims and the amounts they are owed to ensure they are able to recover ratably from any restitution payments made by Kelly (or the other defendants). Therefore, after consultation with defense counsel and pursuant to 18 U.S.C. § 3664(d)(5), the government respectfully moves the Court to defer the entry of the restitution order until after the Farkas sentencing. In particular, the government requests a date approximately one week after the Farkas sentencing to submit to the Court a proposed restitution order for Kelly (as well as all other defendants) that reflects all of the victims identified to date. This will ensure that late-identified victims and changes to loss figures based on additional review are consistently reflected in each restitution order.

*Conclusion*

In accordance with the foregoing and for the reasons stated herein, the United States respectfully requests that the Court impose an initial sentence at the statutory maximum of five years of incarceration and then, for the reasons set forth in the government's substantial

assistance motion, reduce that sentence by approximately 75% for an ultimate sentence of one year and one day of incarceration.

        Respectfully submitted,

        Neil H. MacBride
        United States Attorney

By:        /s/
        Charles F. Connolly
        Paul J. Nathanson
        Assistant United States Attorney
        Eastern District of Virginia
        U.S. Attorney's Office
        2100 Jamieson Avenue
        Alexandria, VA 22314
        Phone: (703) 299-3700
        Fax: (703) 299-3981
        Charles.Connolly@usdoj.gov


        Denis J. McInerney
        United States Department of Justice
        Chief, Criminal Division, Fraud Section

By:        /s/
        Patrick F. Stokes
         Deputy Chief
        Robert A. Zink
         Trial Attorney
        U.S. Department of Justice
        1400 New York Avenue, NW
        Washington, DC 20005
        Phone: (202) 305-4232
        Fax: (202) 514-7021
        Patrick.stokes2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of June, 2011, I filed electronically the foregoing Position of the United States with Respect to Sentencing using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Alan H. Yamamoto
Law Office of Alan Yamamoto
634 S. Washington St
Alexandria, VA 22314
Phone: (703) 684-4700
Fax: (703) 684-6643
Email: yamamoto.law@verizon.net

I have also sent a copy of the filing to the following:

Robert A. Leventhal
111 N. Orange Avenue, Suite 700
Orlando, FL 32801
Phone: (407) 849-6161
Email: bob@leventhal-slaughter.com

Karen Moran
Senior U.S. Probation Officer
Karen_Moran@vaep.uscourts.gov

                                                                    /s/
                                        Paul J. Nathanson
                                        Assistant United States Attorney
                                        U.S. Attorney's Office
                                        2100 Jamieson Avenue
                                        Alexandria, VA 22314
                                        Phone: (703) 299-3700
                                        Fax: (703) 299-3981
                                        Email: Paul.Nathanson@usdoj.gov